THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DENNIS G. HOLVECK, Defendant-Appellant.

First District (5th Division)   No. 85—1457

Opinion filed May 20, 1988.

Paul P. Biebel, Acting Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr.,

40

James E. Fitzgerald, and Kevin J. Moore, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant Dennis G. Holveck was convicted of deviate sexual assault and unlawful restraint, receiving concurrent prison terms of 25 years and 3 years for those respective crimes.

On appeal defendant contends: (1) incriminating statements he allegedly made following his arrest should have been suppressed because the arrest was illegal; (2) his guilt was not proven beyond reasonable doubt; (3) the trial court denied defendant his right to a public trial; (4) it was error to permit testimony concerning the details of complaints made by the complaining witnesses; (5) it was error to permit the substantive use of testimony concerning an out-of-court identification of a newspaper photograph of the defendant; (6) a witness should not have been permitted to offer her opinion as to the meaning of a child's identification of the defendant's photograph as "stranger danger"; (7) the court erred in denying defendant's request that charges of indecent liberties arising out of a prior incident be joined with the charges at issue here; (8) the State failed to disclose to the defendant a crucial police report; (9) defendant's 25-year sentence was excessive.

We reverse and remand for a new trial.

The pertinent evidence at trial was as follows. Three complaining witnesses, all six years old at trial and five years old at the time of the incident, testified that they were walking to school from the home of their baby-sitter when they encountered a man in a car who offered them a ride to school. J.L. testified that the car was silver or gray, with two doors. The man had black hair, a moustache, and was wearing blue jeans. She sat in the backseat with J.W. while J.B. sat in the front seat, which had a hole in it. There was garbage in the car: paper, cups, and clothes. J.L. and J.B. touched the man's "wiener." J.B. touched him with her hand and J.L. touched him with her mouth. She had to suck him. The man said he would throw them in the street if they did not do this. He then let them out and J.L. spit out "stuff" on the grass and on J.W.'s pants. They then returned to the home of the baby-sitter, Kathy, whom they told about having been in a "stranger danger's" car. That night J.L. talked to her mother about what happened.

J.W. testified that during the incident when she began crying the

man said he would throw her out on the street if she did not stop. The man also said if they wanted to get out they would have to "wriggle" his wiener and suck it. J.B. "wriggled" it and J.L. sucked it. The man let them out and they told Kathy what happened. J.W. also told her mother what happened. She did not recall seeing J.L. spit on her pants or on the grass.

J.B. testified that the car was a gray two-door with a black interior. There were many clothes in the car, and it had a torn front seat. The man asked her to stroke his "wiener." J.L. touched the man with her mouth and J.B. touched his "wiener" with her hand. Before this, when they began crying, the man said he would throw them out on the street if they did not stop. After they touched him they were let out and J.B. reported what had happened to Kathy and the police.

J.B. described her assailant in court as having curly hair and a moustache. She recalled that subsequent to this incident she saw a newspaper on her kitchen table and recognized a picture of a man whom she recognized as "stranger danger." In court J.B. was shown the photograph, which apparently portrayed three men. (The photograph has not been included in the record on appeal.) She identified the defendant's likeness in the photograph as the man that was in the car.

The mothers of J.L. and J.W. as well as the children's baby-sitter, Kathy, testified in detail concerning the accounts of the incidents related to them by the children. J.L.'s mother testified that J.L. said when she put her mouth on the man's "wiener," "white stuff" came out, which she spit out. According to J.W.'s mother, J.W. said the inside of the car was black and very messy, with clothes, towels, and many red cigarette boxes.

Kathy testified that she had told the children not to talk to strangers and had referred to people who were not nice as being "stranger danger." On November 16, 1983, the children left her home for school at about 12:30 p.m. When they returned at about 1:20 p.m. she asked them why they were back. They were evasive at first but then admitted to having been in a car with a man. They told her that J.L. "had to suck his wiener" and J.B. had to make an up and down motion with her hand on it. Kathy called the police and the school. She explained to the children that this was the "stranger danger" they had been warned about. At trial Kathy testified concerning descriptions given her by the children. The car was a grayish–silver two-door with a black interior which was very messy. J.W. told her there were red and white cigarette packages on the floor. J.L. said the man was older than Kathy's husband, who was then 36 years old. A tape re-

cording of Kathy's call to the police established that the initial description she reported was of a silver or gray or white car. She relayed a description of the assailant as having straight dark hair and a moustache.

The incident in question took place in Barrington. Investigator Jack Humer of the Barrington police department testified that he interviewed the girls at their school at about 1:30 p.m. on the day of the incident and then again spoke to J.B. and J.W. at their homes the following day. All three described the man as having brown curly hair and a brown moustache. J.B. said the car was gray, with a black interior, vinyl bucket seats, and a hole in the right front driver's seat. J.W. told him there were many red and white cigarette packs in it. In court Humer also identified certain photographs as accurately depicting the exterior and interior of defendant's car. Humer, who had questioned defendant on November 18, 1983, said that on that day defendant had curly hair. According to Humer defendant's hair in court was wavy at the most.

Streamwood patrolman Robert Buschbacher testified that on November 18, 1983, he stopped the defendant and asked him if he would come to the police station. Streamwood police investigator Dennis Maggio testified that he questioned defendant at about 9 a.m. that day, after first advising him of his *Miranda* rights. Defendant admitted that while driving around Barrington he picked up two or three little girls and drove around with them while he fondled his penis. One of the girls climbed in the front seat and began petting him. Defendant stated that it was possible that oral sex took place. When the girls began screaming and crying defendant dropped them off close to where he had picked them up. Defendant's statement was not recorded or transcribed.

Following this statement, Maggio notified the Barrington police. Two officers from that department, including Investigator Humer, came to question him. According to Humer defendant stated that he had picked up three girls. At defendant's request one of the girls touched his penis and another crawled into the front to suck him. Humer did not reduce this statement to writing.

Assistant State's Attorney Casimir Bartnick testified that when he questioned defendant that morning defendant admitted picking up two or three young girls who asked him for a ride to school in his gray Pinto. While driving he exposed his penis. One girl climbed into the front seat and began playing with his penis. He did not recall having oral sex with one of the girls, but admitted this may have happened. He denied having ejaculated. When one of the girls began cry-

ing he let them off. Bartnick also testified that he did not subsequently conduct a lineup for the girls because he thought he had enough evidence and believed the girls had been traumatized enough.

Mohamed Tahir, a State forensic serologist, testified that he detected seminal material on the pants worn by J.W. that day. He also tested the pants for the presence of saliva but found none.

Defendant denied committing the acts in question and also denied making the statements attributed to him by the State's witnesses. He asserted that he told Maggio to write down whatever he wanted. Maggio would answer his own questions and then write the answers down. Defendant also denied having made incriminating statements to the Barrington officers or to Assistant State's Attorney Bartnick.

According to defendant he had stayed at the home of Richard Kappler in Streamwood from November 15, 1983, to November 18, 1983. He had been helping Kappler prepare the house for painting. On the 16th he ran several errands in Streamwood and then returned to Kappler's house at about 11:30 a.m. He then began to work and did not leave the house until the 17th. Defendant testified that he did not loan his car to anyone else during this time. He could not recall if there were red and white cigarette boxes in his car on the 16th, but stated that there could have been because he smoked Marlboros, which were those colors. He also testified that his car was light gray, with a black interior and had many tears in the front seat.

It was stipulated that hairs recovered from the interior of defendant's car did not come from any of the girls. Hairs found on the shoes and clothing of the three girls were not those of the girls or of defendant. Also, fibers from the three girls' clothing and shoes did not come from the carpet in defendant's car.

In rebuttal Richard Kappler testified that defendant, whom he had known about 20 years, was staying with him on November 16, 1983. He saw the defendant from lunchtime on for about two hours. Defendant left at about 2 or 2:30 p.m. He remembered it was lunchtime because he saw school children coming home, and they usually came home around noon. Kappler admitted that on the day of defendant's arrest he told police defendant did not stay with him on the 16th, but Kappler indicated that he meant defendant did not stay overnight on that day. Kappler did not recall having told the police that he did not see defendant at all that day.

Detective William Schaeffer of the Hanover Park police department testified that the day of defendant's arrest Kappler told him defendant left Kappler's house the morning of the 16th and he did not see him again until the afternoon of the 17th.

A State investigator testified that Kappler told him he saw defendant as early as 11 a.m. on that day and defendant stayed from 15 minutes to two hours before leaving. According to the investigator it took about 17 minutes to drive from Kappler's house to the children's school.

OPINION

I

We first consider defendant's contention that his statements should have been suppressed as the products of an illegal arrest. At the hearing on defendant's motion to quash that arrest the following pertinent evidence was adduced.

Defendant testified that early on the morning of November 18, 1983, he was visiting Richard Kappler at Kappler's Streamwood home. At about 8 a.m., defendant and Kappler drove away from the house in defendant's car, a gray Ford Pinto. Defendant saw flashing red lights and was stopped by two police cars. Defendant got out of his car as uniformed police officers approached from both cars. The police asked for his driver's license, which he gave them. They then asked defendant if he could go with them to the police station to answer some questions and to "get a matter cleared up." Defendant responded "sure." However, when he put his hand out for his license he was told he would have to go to the police station to pick it up. He then drove to the station, with one squad car driving in front of him and one behind him. At the station one car stopped 10 feet ahead of him and another stopped in the driveway. He was told to park his car in a particular spot. As he entered the station house one officer followed him in and another remained in the police car. He was directed by a police officer to a small room, where he was told to have a seat. A police officer was guarding the door, and defendant testified that he did not feel free to walk out. Defendant also testified that when he was first stopped he did not believe he had any choice but to go to the police station. Defendant was then questioned by Investigator Maggio and other officers. Defendant denied ever making any incriminating statements, but the State's evidence was that within 30 minutes he began to make such statements. At trial[1] defendant also testified that before being questioned he was informed of his *Miranda* rights and

---

[1] In reviewing a trial court's ruling on a motion to quash an arrest or to suppress evidence all the evidence adduced at trial may also be considered. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

signed a waiver of those rights.

On cross-examination defendant testified that the police who stopped him never took his keys, drew their weapons, touched him, or told him he was under arrest. His friend, Richard Kappler, was never told to get out of the car. However, Kappler accompanied the defendant to the police station. Defendant also testified that he was never told he did not have to follow the police to the station, that he could come back another time, or that he could get up and leave.

Robert Buschbacher, the Streamwood police officer who stopped the defendant on the street, testified that he was on patrol on the day in question when he was advised by another police car that they had observed "a car that we were looking for" parked in front of a house. At roll call that morning Buschbacher was told that the police had received two anonymous tips that a gray car had been acting suspiciously. Buschbacher was given the license plate number of that car and was told to try to locate it. He initially testified that he was given no other information at roll call. But he subsequently testified that he was also told that the gray car was sought in connection with a search for the person who had attempted to pick up or who had picked up some children. He was not given a name or description of the person being sought, nor was he told whether any of the children involved had identified the car. He was merely told that the gray car was a suspicious car. Buschbacher testified that when he first saw defendant's car it was parked in front of a residence. He made no attempt to inquire of the residents because he had been told to keep the car under surveillance.

When defendant and Kappler drove away, Buschbacher contacted the Streamwood police station and asked if they wanted the car stopped. He was told yes. According to Buschbacher he was told to "invite" the driver to come into the police station but he was also specifically told not to arrest the driver. Buschbacher then stopped defendant's car, although he conceded that defendant was not then breaking any laws and he had no reason to arrest defendant. As he stopped the defendant another police car drove up with its Mars lights on and parked behind Buschbacher's vehicle. An officer from that car approached defendant's car with Buschbacher. Both officers were in uniform with their weapons in view. Buschbacher then "invited" defendant to come back to the station and he agreed. At trial Buschbacher testified that he "asked" defendant if he would come to the station. At the hearing Buschbacher testified that both police cars followed defendant to the station but at trial he testified that one car drove in front of defendant's car and the other car followed the

defendant. Buschbacher testified that defendant was free to leave after being stopped. Buschbacher did not draw his weapon, handcuff, or search the defendant. However, he also never informed him that he did not have to go to the station or that he could come back another time. At the police station Buschbacher took defendant's license from him and gave it to Investigator Maggio, saying "This is Mr. Holveck."

Investigator Maggio testified that when defendant was first brought into the interrogation room Officer Buschbacher was standing outside the room, about three to four feet away, in uniform and armed. Maggio immediately gave defendant his *Miranda* rights and began to question him. According to Maggio it was normal police procedure to advise people being questioned of their *Miranda* rights even though they were not in custody or under arrest. Maggio testified that he considered defendant a suspect in several child molestation cases when he first came in because another police officer, Sergeant Rossay, had told him about "the reports from the night before plus a female calling giving his car description and his license plate." Maggio was not asked to explain this reference. Maggio also testified that defendant was free to leave until he confessed to the molestation of a young boy, after about 10 minutes of questioning.

In arguments on the motion to quash, the State only advanced the theory that defendant had consented to come to the station and be questioned. They did not seek to justify the initial stop of the defendant as based on probable cause or even on the lesser *Terry*-stop standard. Indeed, during the proceedings on the motion, the State had offered to stipulate that they had no probable cause to arrest the defendant when he was stopped on the street. The trial court ruled that defendant was stopped "because of a belief that this [*sic*] was some reasonable connection between a very serious offense which had allegedly occurred involving children of tender years being molested." The court then found that defendant had consented to go to the police station for questioning, noting that there had been no protestations by defendant at the stop or at the station. The court acknowledged that there was a "strong police presence" at the scene of the stop, but also noted that normal arrest activities, such as booking and searching the defendant, had not taken place prior to his making the incriminating statements. Accordingly, the court denied defendant's motion to quash his arrest and to suppress any statements arising from that arrest.

■ The issue before us is whether the trial court correctly found that defendant was not arrested prior to making the first incriminating statement, but instead voluntarily consented to accompany the po-

lice to the police station and submit to questioning. The test to be applied here is whether a reasonable innocent man would have concluded that he was not free to leave when confronted with the circumstances confronting this defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 490 N.E.2d 640.) The test is not a subjective one, and therefore it is irrelevant whether the defendant believed he was under arrest (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979) or whether the police intended to detain the defendant against his will unless that intent was conveyed to the defendant (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319). It is also well established that where there are significant indicia of coercion, a court will not find controlling the fact that a defendant was merely asked if he would accompany police (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222) or that he was not told he was under arrest or made to undergo booking procedures (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248). Among the factors that courts have found significant in determining whether an arrest did take place are whether the defendant was confronted by a significant show of police force (*State v. Winegar* (1985), 147 Ariz. 440, 711 P.2d 579), whether the defendant was told he was free to leave (*People v. Hardy* (1986), 142 Ill. App. 3d 108, 491 N.E.2d 493), whether defendant's freedom of movement was restricted by being deprived of his driver's license (*United States v. Gonzalez* (10th Cir. 1985), 763 F.2d 1127), whether *Miranda* rights were read to him, and the purposefulness of the police conduct (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103).

██ In this cause, accepting only the State's account of the events, the defendant was driving his car in a lawful manner when he was forced to pull over by a police car. A second police car with its lights flashing also pulled up behind the defendant as he was stopped. Two armed and uniformed police officers approached defendant's car and stood by either side of it. Defendant was not asked for any identification nor was he questioned by the officers concerning any suspicions they might have had. Instead he was immediately asked if he would accompany them to the police station for questioning. Both police cars accompanied him to the station. There he was directed to a small room, his driver's license was taken from him, he was given his *Miranda* rights, and questioning began. At the onset of this questioning the police officer who had first stopped him stood several feet outside the entrance to the room. The defendant was never informed that he was free not to accompany the police, or free to leave the sta-

tion. In light of the factors we have cited, we find that, clearly, a reasonable innocent man confronted with this situation would have believed that he was not free to leave at the time that the police began their questioning.

This finding is reinforced by the apparent purposefulness of the police conduct. The State has conceded that the officers had no probable cause to arrest the defendant when he was stopped. Officer Buschbacher admitted that defendant was committing no crime and he had no basis for arresting the defendant. Although this stop of defendant in his car clearly was a seizure for purposes of the fourth amendment (*Delaware v. Prouse* (1979), 40 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391), the State never sought at trial to justify that seizure under even the less stringent standards of *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. For the first time on appeal the State contends that the stop was justified under *Terry* because Officer Buschbacher allegedly possessed information that a suspect in the sexual assault of a young boy had been driving a car similar in description to the defendant's car. The State also suggests that the license number given to Buschbacher had been identified as that of the man involved in that sexual assault. In fact Buschbacher testified that the only information he had was that a gray car was sought in connection with a search for someone who had picked up or attempted to pick up some children and that a car with defendant's license plate had been seen acting "suspiciously." There was evidence at trial that the victims of the offenses at issue here had given to the Barrington police descriptions of their assailant, his car, and the interior of that car, which matched the defendant and his car. But we have found nothing in the record at the hearing or at trial to indicate that this information was transmitted to the Streamwood police department prior to the stop of the defendant. Indeed, Officer Buschbacher testified at trial that when he stopped the defendant he took no special notice of the interior of defendant's car. Nor did any of his testimony establish that he believed that defendant fit a particular description or that Buschbacher or the Streamwood police department was aware of any outstanding description of a suspect.

When police officers are working in concert on an investigation, probable cause for an arrest (or in this instance reasonable suspicion based on articulable circumstances under *Terry*) may be established based on information possessed by any of those officers. (*People v. Peak* (1963), 29 Ill. 2d 343, 194 N.E.2d 322; *People v. Krogh* (1984), 123 Ill. App. 3d 220, 462 N.E.2d 790.) But in this cause there is no evidence suggesting that the Streamwood police department was

working in concert with the Barrington police department. Indeed the evidence affirmatively suggests otherwise. Investigator Maggio of the Streamwood police department testified at trial that he had never been assigned to investigate the Barrington matter. Investigator Jack Humer of the Barrington police department testified at trial concerning the descriptions given him by the victims in this cause. He was specifically asked whether he had related to the Streamwood police one detail of their account, the fact that their assailant had ejaculated. He stated that he had not done so. He was never asked whether he had given any other details to the Streamwood police. Thus it is apparent that the State failed to establish that the Streamwood police were acting on even a reasonable suspicion of criminal activity when they stopped defendant's vehicle. Certainly reports of defendant's vehicle having acted suspiciously on some unspecified prior occasion do not satisfy this standard. Instead, the seizure of the defendant appears to have been investigatory in nature, calculated to elicit information from him. Further evidence of this can be found in the unrebutted testimony of defendant's passenger in the car, Richard Kappler. He testified at trial that he initially waited outside the police station for the defendant, but was then "invited" in, interrogated, deprived of his valuables, shoes, and belt, placed in a cell, photographed, and then released.

■ Based on all of this evidence it is clear that defendant was detained for interrogation without probable cause, in clear violation of his fourth amendment rights. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) It is also apparent that there were no intervening circumstances between this detention and defendant's initial confession such as would break the causal connection between those events. Defendant's confession was elicited within half an hour of the beginning of his interrogation. The only intervening event, the administration of *Miranda* warnings, was at best only a threshold requirement for establishing attenuation. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Therefore the trial court erred in failing to quash defendant's arrest and to suppress the statements elicited from him during his interrogation following that arrest. Based on this finding defendant's convictions must be reversed and the cause remanded for a new trial.

## II

■ Because of the risk of a double jeopardy violation we must also consider defendant's claim of insufficiency of the evidence, despite our conclusion that remand is required. (*People v. Taylor* (1979),

.76 Ill. 2d 289, 391 N.E.2d 366.) Suffice it to say that defendant's inculpatory statements, corroborated as they were by the victims' account, and defendant's out-of-court identification by one of those victims, establish the sufficiency of the State's evidence at trial.

## III

We next consider defendant's contention that the trial court denied his right to a public trial. At the time of trial section 115—11 of the Code of Criminal Procedure of 1963 provided that in a criminal prosecution

> "where the alleged victim of the offense is a minor under 13 years of age, the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media." (Ill. Rev. Stat. 1985, ch. 38, par. 115—11.)

Defendant contends that this statute is unconstitutional because it does not require that the court set out on the record its reasons for such an exclusion. We do not reach the merits of the contention for we find that in any event the trial court's application of this statute was unconstitutional. In *Globe Newspaper Co. v. Superior Court* (1982), 457 U.S. 596, 73 L. Ed. 2d 248, 102 S. Ct. 2613, the United States Supreme Court recognized the qualified first amendment right of the press and public to attend a criminal trial. In *Waller v. Georgia* (1984), 467 U.S. 39, 81 L. Ed. 2d 31, 104 S. Ct. 2210, the court also held that an accused has a qualified sixth amendment right to a public trial, thus helping to assure that the judge and prosecutor exercise their duties responsibly, and encouraging witnesses to come forward, while discouraging perjury. Those cases also establish that only in rare instances may the right to a public trial be overcome. As stated in *Waller*:

> "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." (467 U.S. at 48, 81 L. Ed. 2d at 39, 104 S. Ct. at 2216.)

In *Globe Newspaper Co.* the court found that although safeguarding the physical and psychological well-being of a minor was a compelling interest which could support closure, such a determination should be made by trial courts on a case-by-case basis. The court noted that pertinent factors for consideration by the trial court would include the

age, psychological maturity and understanding of a minor witness, the type of crime at issue, and the wishes of the victim and the victim's family. *Globe Newspaper Co.*, 457 U.S at 607-08, 73 L. Ed. 2d at 258, 102 S. Ct. at 2620-21.

■ The record in this case establishes that, over defendant's objection, when the victims testified the court closed the courtroom to all spectators except members of the press, some of the victims' family members, and some counselors from the victims' school. The sole reason cited by the court for the closure was the "unnerving effect" on the children if the courtroom were crowded and wanting to make the unpleasant experience of testifying as pleasant as possible for them. The record thus fails to establish that the trial court engaged in the careful balancing of interests and the individualized evaluation of factors required to override the defendant's qualified sixth amendment right to a public trial. Accordingly, we find that the court erred in closing portions of defendant's trial to the general public. Our determination of this issue does not, however, indicate that such a closure would not be proper upon a full evaluation by the trial court of the pertinent interests and factors.

## IV

■ Defendant also contends that the trial court erred in allowing detailed testimony of third persons concerning the victims' accounts of the attack to those persons. Under Illinois law, in prosecutions for sexual acts perpetrated on children under 13, third persons may testify to the fact that the child complained to them concerning such an act. (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.) But this statute permits only testimony that the complaint was made and it is error to permit testimony concerning the details of the complaint. (*People v. Salas* (1985), 138 Ill. App. 3d 48, 485 N.E.2d 596; *In re R.D.* (1985), 131 Ill. App. 3d 612, 476 N.E.2d 62.) In this cause the trial court permitted witnesses who had heard the complaints of the victims to testify in extensive detail concerning the descriptions they had provided of their assailant and his car, the conversations they had with the assailant, and the events leading up to and following their encounter with him. Clearly the court erred in permitting such testimony.

## V

■ We find no merit to defendant's contention that it was error for the trial court to permit substantive use of testimony concerning J.B.'s out-of-court identification of a newspaper photograph of defendant as that of "stranger danger." In *People v. Rogers* (1980), 81 Ill.

2d 571, 411 N.E.2d 223, our supreme court held admissible testimony by a third person concerning an out-of-court identification by a witness when that witness also testifies at trial concerning that identification and is therefore subject to cross-examination. However, the court restricted the use of that evidence to corroboration of an in-court identification. In this cause there was no in-court identification and the substantive use of J.B.'s out-of-court identification would have been improper under *Rogers.* However, in response to *Rogers* the Illinois legislature enacted section 115—12 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 115—12), which provides:

"Substantive Admissibility of Prior Identification. A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him."

Clearly by the plain terms of this enactment the substantive use of testimony concerning out-of-court identifications is now permissible without regard to the existence of an in-court identification. As stated in the Handbook of Illinois Evidence:

"[P]rovided the declarant testify at trial and be subject to cross-examination concerning the prior statement of identification of a person made after perceiving him, the prior statement of identification, testified to by the declarant or other witness, including a police officer, is now admissible as an exception to the hearsay rule as substantive evidence without regard to whether the statement of prior identification corroborates a positive in-court identification by the declarant, is offered as a substitute for in-court identification, or to bolster a weak in-court identification on the part of the declarant. Similarly, the declarant's prior statement of identification is admissible as substantive evidence when testified to by a witness to the identification, such as a police officer, even when the declarant at trial denies making or repudiates the identification and denies that the defendant was involved in the crime." (E. Cleary & M. Graham, Handbook of Illinois Evidence § 611.16 at 405-06 (4th ed. 1984).)

We recognize that another division of this court has held that this provision only permits substantive use of out-of-court identifications when they are consistent with an in-court identification. (*People v. Davis* (1985), 137 Ill. App. 3d 769, 484 N.E.2d 1098.) In *Davis* the court was focusing on the use of inconsistent out-of-court statements,

which it found to be governed by another statutory provision. (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.) But, in any event, we find the language of section 115—12 to be clear and unequivocal in permitting substantive use of out-of-court identification evidence when the declarant testifies, without regard to whether an in-court identification is made. Consequently, the trial court properly permitted the testimony at issue.

## VI

■ Citing *People v. Linkogle* (1977), 54 Ill. App. 3d 830, 368 N.E.2d 1075, defendant also contends that this court improperly permitted Kathy to testify as to her opinion of what J.B. meant by the phrase "stranger danger." In *Linkogle* it was found to be reversible error to allow the mother of the complaining witness to testify as to what she thought her daughter meant by saying the defendant had begun to "wiggle his thing." The court held that a lay witness should confine her testimony to statements of fact of which the witness has personal knowledge. But in this cause Kathy did not give her opinion of what J.B. meant by the phrase "stranger danger." She testified to the fact that she had told J.B. and the other girls that the strangers they should avoid were "stranger dangers" and that the man they had encountered was "stranger danger." It was J.B. herself who testified that the "stranger danger" she identified was the man in the car. Therefore we find no error in Kathy's factual testimony.

## VII

■ At the time of this trial defendant had also been charged with sexual offenses involving an encounter with a young boy in Streamwood on November 11, 1983. (Defendant's appeal of his convictions arising out of those charges is pending before another division of this court.) Defendant contends that the trial court erred in denying his motion for joinder of those charges. The decision to consolidate separately charged offenses is within the discretion of the trial court. (*People v. Carmack* (1977), 50 Ill. App. 3d 983, 366 N.E.2d 103.) However, joinder should not be permitted where offenses are unrelated, are several days apart, or if there is no apparent concert of action. (*People v. Higgins* (1979), 71 Ill. App. 3d 912, 390 N.E.2d 340.) Here defendant apparently is alleged to have made inculpatory statements concerning the Streamwood incident at the same time as his statements concerning the Barrington incident. But the incidents were weeks apart, occurred in separate towns, and involved different victims. The record also fails to affirmatively establish a common scheme in their perpe-

tration. Thus there was no abuse of discretion in the trial court's ruling.

## VIII

In a separate *pro se* brief filed with this court defendant asserts that the State failed to disclose to the defense a Streamwood police report containing a description of a man involved in the October 31, 1983, attempt to pick up two young boys. In fact the record establishes that the defense was in possession of this report and utilized it in cross-examining its author, Officer Buschbacher, in a hearing on a pretrial motion to dismiss the Streamwood charges. That hearing occurred on January 30, 1984, well in advance of the hearings and trial in this cause. Defendant's contention is false and without merit.

## IX

Because of our disposition of this cause, we do not reach the merits of defendant's contention concerning his 25-year sentence.

For the reasons set forth in this opinion we reverse defendant's convictions and remand the cause for a new trial.

Reversed and remanded for a new trial.

MURRAY and PINCHAM, JJ., concur.