THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KELSIE WICKS, Defendant-Appellant.

First District (1st Division)   No. 1—90—0504

Opinion filed September 21, 1992.—Rehearing denied October 30, 1992.

Michael J. Pelletier and Pamela A. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Gael O'Brien, Special Assistant State's Attorney, and Renee Goldfarb and Jeanne Lobelson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Kelsie Wicks was found guilty of murder. The trial judge sentenced defendant to 26 years in the Illinois State penitentiary. The issues defendant raises on appeal are: (1) that he was arrested without probable cause in violation of his fourth amendment right to be free from unreasonable searches and seizures; therefore, his inculpatory statement should have been suppressed as the fruit of an illegal arrest; (2) that his statement to police and his waiver of his *Miranda* rights were involuntary and, therefore, his statement should have been suppressed; (3) that he was deprived of his right to a fair trial where the prosecutor, during rebuttal closing argument, extensively argued facts about the principles of physics to the jury which were not admitted into evidence and which significantly bolstered the State's theory as to a crucial issue at trial; and (4) that he was not proven guilty beyond a reasonable doubt.

On May 4, 1987, at approximately 6 a.m., a security guard at South Shore Hospital discovered an unconscious woman, later to be identified as Treigi Harrison (the victim), in the bushes by the hospital entrance. She had a hole in the right side of her forehead and was wrapped in a green blanket. The victim died two days later. According to Dr. Edmund Donoghue, deputy chief medical examiner of Cook County, the victim died of injuries to her brain and skull due to blunt force. There were two major injuries to her brain. The first injury on the front of her head was caused by a severe blow. A second injury on the back of her head was caused by her falling backwards.

Shortly after the victim was found, Detectives Phelan and Higgins were assigned to investigate. They found a label on the green blanket with Kelsie Wicks' (defendant's) name and address on it. The detectives went to the address, were informed that defendant had moved and were given his new address. They then proceeded to defendant's new address and encountered defendant as he was entering the building.

Defendant testified in court that he first came in contact with the detectives in the vestibule of his apartment building at approximately 8:45 a.m. He stated that the detectives told him he would have to go down to the station with them. He asked why, and the detectives replied that he would be told the reason at the station. He testified that he was read his *Miranda* rights and then driven to the station and placed in an interrogation room. He was told about a woman who had been beaten and, at approximately 30-minute intervals, questioned

about his "whereabouts" the previous day. According to defendant, at approximately 11 a.m., the detectives requested permission to search his apartment and he told them it would be "perfectly fine." He stated that the detectives left him in the interrogation room while they went to execute the search and that after the search, they questioned him further about what he did the previous day. He was shown a picture of the victim and, at that time, was unable to identify her.

Defendant further testified that in the afternoon a second set of detectives came on duty and asked him to take a polygraph test to which he assented. According to defendant, on the way to the test, they engaged in a "general conversation" about matters unrelated to the case. They also stopped to investigate his alibi for the day before, but apparently the woman he stated he was with was not home. After the polygraph examination, they stopped to pick up food from McDonald's on the way back to the station. According to defendant, the detectives told him he had "flunked the box" and that they knew he was lying. Defendant testified that they told him that they were there to help him, but he would have to help himself and if the blanket were connected to him at all he could be convicted of a crime. He testified they informed him that the victim was doing well and that if he "admitted to some kind of incident with her" he could "bond out" that night. He stated that the detectives convinced him that if he admitted to something he would only get a light charge of battery compared to what he would be facing otherwise. According to defendant's testimony, he then looked at the picture of the victim again and this time told the detectives that the picture resembled someone he knew. He testified that, tired and afraid, and with the help of the detectives, he concocted the story which, at approximately 1 a.m. the following morning, he repeated to Assistant State's Attorney Mary Lou Norwell.

According to defendant's statement, at approximately 5:30 a.m. on May 4, 1987, he picked up the victim at the corner of 79th and Jeffrey Streets. He had had sex with the victim before, and on this date she agreed to have sex with him for $15. Defendant drove with the victim to 83rd and Yates, where the victim performed an act of oral copulation on the defendant. They then drove to 80th and Yates, where defendant told her he did not have any money. The victim jumped out of the car yelling, took defendant's jump rope with her and made a motion as if to hit the car with it. Defendant followed her out of the car and struggled with her to retrieve his jump rope. He struck her twice, once on the face and once on the top of her head with the wooden jump rope handles, and she fell to the ground.

Defendant picked her up, wrapped her in a blanket he had in his car, and drove her to South Shore Hospital.

On cross-examination, defendant testified that the detectives who met him in the vestibule of his apartment were in plain clothes and drove him to the station in an unmarked squad car. He stated he was not physically assaulted or handcuffed or ever told he was under arrest. At the station, he was not fingerprinted or handcuffed until he had made his incriminating statement. He stated he understood his rights as they were read to him, but he did not request an attorney. At the time of the incident, defendant was 35 years old, had attended four years of college and sold real estate.

Detective Phelan testified that they met defendant in the vestibule at approximately 10:30 a.m. He stated he informed defendant that a badly beaten black female was discovered wrapped in a blanket which had defendant's name and address affixed to it. Defendant responded by saying he had not seen the blanket in a while. According to Detective Phelan's testimony, the detectives asked defendant to accompany them to Area 2 to assist in the investigation and he agreed. Defendant was transported to the police station in an unmarked squad car, but was not handcuffed. They arrived at the station at approximately 11 a.m. and defendant was placed in an interrogation room where he was read his *Miranda* rights and questioned about the blanket and his whereabouts the previous day. He signed a consent to search form and waited at the station while the detectives went to search his apartment. Phelan testified that when they returned they asked him if he would take a polygraph test. He agreed and an appointment was set up for later that evening. Phelan also stated he did not have any other conversations with the defendant, did not promise him leniency for his statement, and did not psychologically coerce defendant into making a statement. Additionally, the defendant was not fingerprinted, handcuffed, or told he was under arrest until after his incriminating statement.

Detective Butler testified that after he came on duty and met defendant in the interrogation room, he read defendant his *Miranda* warnings and informed him that he and his partner would be taking him for the polygraph test. After the polygraph examination, he told defendant that he had flunked and that they knew he was lying. Defendant then told them his alibi for the night before and they went to check it out on the way back to the station. According to Butler, defendant also asked them what he would be charged with if, in fact, he had anything to do with the incident. On the way back to the station they picked up some food and defendant was left alone in the interrogation room to eat

it. Butler testified that after he ate, they read him his *Miranda* rights again and at approximately 10:30 p.m. he made an admission. After defendant made this admission, the detectives retrieved a leather jump rope with hollow wooden handles from defendant's van. Butler testified that he did not mentally coerce defendant or misrepresent facts or promise defendant leniency for a statement. In addition, he stated that defendant never indicated he wanted to speak to an attorney.

Defendant filed a motion to suppress his incriminating statement on numerous grounds which was denied. After being found guilty of murder, defendant moved for a new trial which was also denied.

# I

Defendant contends on appeal that he was illegally arrested without probable cause when he was first met by the police in the vestibule of his apartment building and taken to the police station at a time when the only evidence against him was that the victim was discovered wrapped in a blanket with his name and address on it. Defendant contends that this blanket did not establish probable cause and, since his inculpatory statement was a direct result of this illegal seizure, it should have been suppressed as the fruit of an illegal arrest. If he was not arrested at that point, defendant asserts that the subsequent conduct of the police "created a coercive environment in which a reasonable innocent person would not have felt free to leave." The State maintains that defendant was not arrested until after he admitted to beating the victim. Assuming he was detained prior to making his confession, the State argues that the blanket established the probable cause required to arrest defendant. Alternatively, if the arrest was improper, the State asserts that defendant's confession was sufficiently purged of the primary taint to be admissible.

We conclude after reviewing the evidence that defendant voluntarily accompanied the detectives to the station and was not arrested until after his inculpatory statement. Therefore, it is unnecessary for us to determine whether the blanket with defendant's name on it was sufficient to establish probable cause to arrest. Obviously, as a consequence of this holding, questions of attenuation are rendered irrelevant.

A trial court's finding at a suppression hearing will only be disturbed on appeal if it is manifestly erroneous. (*People v. Long* (1983), 99 Ill. 2d 219, 231, 457 N.E.2d 1252, 1257.) Custodial interrogations are seizures and require probable cause even though the " 'trappings of a technical formal arrest' " may not be present. (*People v. Avery* (1989), 180 Ill. App. 3d 146, 153, 534 N.E.2d 1296, 1300, quoting *Dunaway v. New York* (1979), 442 U.S. 200, 215-16, 60 L. Ed. 2d 824, 838, 99 S. Ct.

2248, 2258.) A person has been seized when, by means of physical force or show of authority, his freedom of movement is restrained such that a reasonable person, innocent of any crime, would believe he is not free to leave. (*United States v. Mendenhall* (1980), 446 U.S. 544, 553-54, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873; *People v. Hicks* (1989), 183 Ill. App. 3d 636, 643, 539 N.E.2d 756, 760.) Therefore, a particular suspect's subjective belief that he is not free to go is irrelevant. (*People v. Holveck* (1988), 171 Ill. App. 3d 38, 47, 524 N.E.2d 1073, 1080.) Additionally, an officer's subjective view that a suspect is under arrest also is not relevant unless that view is conveyed to the suspect. *Holveck*, 171 Ill. App. 3d at 47, 524 N.E.2d at 1080.

In determining what a reasonable person would believe in the situation, a court should view all the circumstances surrounding the incident which may indicate a seizure has occurred. (*People v. Adams* (1988), 169 Ill. App. 3d 284, 287, 523 N.E.2d 1103, 1105, citing R. Ruebner, Illinois Criminal Procedure 5–6 (1987).) The United States Supreme Court has stated that a seizure may be indicated by "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; *Hicks*, 183 Ill. App. 3d at 643, 539 N.E.2d at 760.) Additional factors Illinois courts will consider include "whether there was any formal declaration of arrest and whether other routine procedures associated with arrest were present, such as searching, booking, handcuffing, fingerprinting, and photographing." (*People v. Johnson* (1989), 187 Ill. App. 3d 756, 769, 544 N.E.2d 392, 400.) "The test is intentionally imprecise because it focuses on the coercive effect of police conduct taken as a whole, and not on each particular detail of the police conduct in isolation." *People v. Avery* (1989), 180 Ill. App. 3d 146, 153, 534 N.E.2d 1296, 1300, citing *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.

We do recognize that the situation in this case does have the "look" of an arrest in several respects. Defendant was driven to the station by the detectives, read his *Miranda* warnings, and questioned in a police interrogation room. However, driving a person to the station to be interviewed and being extra cautious by informing the person of his rights under *Miranda* does not automatically convert a consensual conversation into a custodial situation. (*Wipfler*, 68 Ill. 2d at 171, 368 N.E.2d at 875.) These facts are immaterial if, under the circumstances, a reasonable innocent person would still have believed he was free to go at any

time. Otherwise, an officer could never drive a person to the station for a consensual interview and inform that person of his constitutional rights before they begin speaking unless the police had probable cause to arrest the person. See *Wipfler*, 68 Ill. 2d at 169, 368 N.E.2d at 873.

■ In view of the police conduct as a whole, the record in this case supports the trial court's denial of defendant's motion to suppress his statements because they were the result of an illegal arrest. Defendant was met in the vestibule of his apartment by two plainclothes detectives and not overwhelmed by a number of armed uniformed police officers. According to defendant's testimony, the detectives did not "grab" or physically touch or accost him. Apparently, the detectives did not draw their weapons, and there is no testimony to indicate that the officers' language or tone of voice was threatening. In addition, defendant testified he was not handcuffed at any time before he gave his incriminating statement. He was never told he was under arrest, nor was he photographed, fingerprinted or booked. The only real conflict in the testimony concerns what was said when defendant and the detectives first encountered each other. Defendant stated that the detectives told him they were taking him to the station and they would tell him why at the station. Detective Phelan, on the other hand, testified that when they first encountered defendant in the vestibule, he told defendant that a badly beaten black female was discovered wrapped in a blanket with defendant's name affixed to it. He asked defendant if he would accompany them to the station and defendant said he would. The trial court has the duty of resolving conflicts in the evidence and judging the credibility of witnesses (*People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 163, 586 N.E.2d 292, 307) and, apparently, the trial court found Detective Phelan's testimony more credible than defendant's. Based on the uncontested facts above and the testimony of Detective Phelan, the court could determine that defendant was not illegally arrested in the vestibule of his apartment, but accompanied the detectives to the station voluntarily.

Additionally, we reject defendant's assertion that the subsequent conduct of the police "created a coercive environment in which a reasonable innocent person would not have felt free to leave." In each case, the court must examine all the circumstances surrounding the police questioning of a suspect when determining whether the interrogation was custodial. (*People v. Brown* (1990), 136 Ill. 2d 116, 124, 554 N.E.2d 216, 220.) As the Illinois Supreme Court recognized in *Brown*, due to the numerous factors to be considered, different courts have given different weight to similar factors. (*Brown*, 136 Ill. 2d at 125, 554 N.E.2d at 220.) However, a reviewing court must always keep in mind that it

must give deference to the findings of the trial judge who heard the witnesses and weighed the often conflicting evidence and only reverse a trial court's conclusion if it is manifestly erroneous. *Brown*, 136 Ill. 2d at 125, 554 N.E.2d at 220.

█ In the instant case, defendant testified he was not physically mistreated. He also stated that he was not handcuffed at any time prior to his admission. He was fed, offered the use of the bathroom facilities and a cigarette. Defendant testified he was not handcuffed or questioned on the way to the polygraph examination, but engaged in "general conversation" unrelated to the investigation. As stated above, the police did not subject him to the routine police procedures normally associated with an arrest such as fingerprinting, photographing, or booking. There is also evidence that defendant was often left alone in the interrogation room, only questioned specifically about the case when he first arrived at the station, and testimony from Detective Butler that the door was unlocked. Therefore, in view of our limited role of review and the trial court's function of assessing the credibility of witnesses and resolving conflicts in the evidence, we conclude that the trial court's denial of defendant's motion to suppress his statement as the fruit of an illegal arrest was not manifestly erroneous.

## II

Defendant also asserts that his inculpatory statement was not the result of a "free and rational choice," but a product of the coercive atmosphere created by the police. He contends his approximately 14-hour detention coupled with the fact that he was held incommunicado the whole time and fed only once during that period created a subtly coercive environment in which his will was overcome. Therefore, his statement and his waiver of *Miranda* rights were involuntary.

The State must show by a preponderance of the evidence that a defendant's confession was voluntary in order to survive a defense motion to suppress. (*Fauntleroy*, 224 Ill. App. 3d at 163, 586 N.E.2d at 307.) A trial court's determination that such a statement was voluntary will not be reversed unless it is against the manifest weight of the evidence. (*People v. Young* (1990), 206 Ill. App. 3d 789, 806, 564 N.E.2d 1254, 1266.) A voluntary statement is one that can be said to have been made freely and without compulsion in view of the totality of the circumstances (*Young*, 206 Ill. App. 3d at 805-06, 564 N.E.2d at 1266); no single factor is determinative. (*People v. Jones* (1990), 196 Ill. App. 3d 937, 957, 554 N.E.2d 516, 528.) Factors to be considered in determining the voluntariness of a defendant's incriminating statement include "the defendant's age, intelligence, background, experience, mental capacity

and education, physical condition at the time of questioning, duration and legality of detention, and any physical or mental abuse by police, including the existence of threats or promises." (*Jones*, 196 Ill. App. 3d at 957, 554 N.E.2d at 528.) In addition, it is the trial court's job to assess the credibility of the witnesses and resolve conflicts in the evidence. *Fauntleroy*, 224 Ill. App. 3d at 163, 586 N.E.2d at 307.

■ In this case, after review of the record, we cannot say that the trial court's determination was against the manifest weight of the evidence and that defendant's statement was not made "freely and without compulsion." We already concluded that defendant was not in police custody during the 14-hour period between his initial contact with the police and his incriminating statement. Even assuming *arguendo* that defendant was in custody, such a prolonged detention does not conclusively establish that his statement and his waiver of his *Miranda* rights were involuntary. (See *Young*, 206 Ill. App. 3d at 806, 564 N.E.2d at 1266.) Here, defendant was 35 years old at the time of the incident and had four years of college education. The record reflects he was in good physical condition and exercised regularly. Defendant testified that he was not "grabbed" and brought to the station. He also testified that his statement was not physically coerced and that he was not handcuffed at any time prior to making his incriminating statement. He stated he was read his *Miranda* warnings at least twice and that he understood them. Additionally, he admitted he never invoked those rights and never told the officers he wanted an attorney. Defendant's assertion that his statement was elicited from him through promises of leniency was denied by both Detective Phelan and Detective Butler. The evidence in the record clearly supports the trial court's denial of defendant's motion to suppress on the grounds that his statement was involuntary. The little conflicting testimony there was in the record was for the trial court to resolve and, as such, we will not reverse the trial court's conclusion that defendant's statement was given voluntarily.

### III

Defendant's third contention on appeal is that the prosecutor improperly argued facts during closing argument about the principles of physics which were not admitted into evidence. Defendant asserts that this argument went to a crucial issue and, therefore, denied him his right to a fair and impartial trial. The State maintains that defendant waived this argument by failing to specifically raise the error in his post-trial motion. As a general rule in Illinois, a defendant must object to perceived trial errors both in court and in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, 1130-31.) In this

case, defendant objected promptly at trial to the prosecutor's argument and made a general objection to the State's "prejudicial and improper comments and argument in the presence of the jury." Defendant's objections were specific enough to satisfy *Enoch* and preserve the issue for review. Alternatively, the State maintains that the prosecutor's comments were based on the evidence and common sense and invited by defense counsel's argument.

A prosecutor's comments during closing argument can be based upon facts in evidence or reasonable inferences from those facts. (*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 974, 523 N.E.2d 136, 141, citing *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.) As such, courts give prosecutors "wide latitude" to comment on the evidence. (*Nightengale*, 168 Ill. App. 3d at 975, 523 N.E.2d at 141.) The State cannot argue facts to the jury during closing argument, however, that are not based upon the evidence presented in the case. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629, 637-38, citing *People v. Beier* (1963), 29 Ill. 2d 511, 517, 194 N.E.2d 280, 283.) Such comments though are reversible error only if "there are reasonable grounds for believing the jury was prejudiced by the improper remarks." (*Whitlow*, 89 Ill. 2d at 341, 433 N.E.2d at 638.) A prosecutor is not permitted to, in effect, testify to the jury during argument. *People v. Jones* (1988), 173 Ill. App. 3d 147, 151, 527 N.E.2d 441, 444, citing *People v. Rothe* (1934), 358 Ill. 52, 56, 192 N.E. 777, 779.

At trial, the State's theory of the case was that defendant bludgeoned the victim with the wooden handles of his jump rope. Dr. Donoghue, the medical examiner, testified that he did not know what was used to inflict the deadly blow to the victim's head. In response to defense questioning Donoghue stated that the jump rope handles were "not it." Later he stated "[i]t is-hard to be 100% certain, but it [the jump rope handle] doesn't seem likely."

In closing argument, defense counsel argued that the State had not proved its case because it had not shown that the jump rope handles were the murder weapon. In commenting on Dr. Donoghue's testimony, defense counsel stated that "[Donoghue] was asked the question three different times and three different times he said no, under no circumstances could these or could this have caused the death and the injuries." The prosecutor objected to this as not accurately reflecting what Dr. Donoghue stated. The court overruled the objection, stating that "the attorneys can make what they feel are reasonable or logical extensions of the evidence. If their arguments are not reasonable, they can be rejected by the jury."

In the State's rebuttal closing argument, the prosecutor argued to the jury that what Dr. Donoghue had testified to was that it was "not likely" that the jump rope handle caused the injury, not that it absolutely was not the cause. In attempting to show that the jump rope handles could conceivably have been the murder weapon, the prosecutor applied the laws of physics. The relevant portion of the trial transcript reads:

"MR. SMITH [Assistant State's Attorney]: Ladies and gentlemen, you heard Dr. Donohue [sic] testify yesterday from the stand. His exact quote was, could these have caused the injury to the front of the head. We are talking about a hit, which is a blow, and a fall to the back of the head. Could these have caused it. He said, not likely.

MR. MCNEAL [Defense attorney]: Objection. I object to counsel misstating the evidence.

MR. SMITH: He said—

THE COURT: The objection will have to be noted. And ladies and gentlemen of the jury will have to rely upon your collective memories as to the testimony that was given yesterday.

Objection noted.

MR. SMITH: He said, not likely. They are not a likely instrument of hitting someone over the head, they are not a likely instrument to use to beat on someone. Maybe a baseball bat, a black jack, something like that. You don't see any warnings; do not hit anyone over the head at a high velocity [sic]. You are not talking about the weight of something. Here's an ordinary penny. Now, that's not likely to inflict great harm. You drop that from great height [sic] off a building and hit someone on the head, it causes a head injury. That's not likely to hurt someone. What does it? Volocity [sic] of it does it [sic]. When there's a tornado, and they'll have some photograph of a piece of straw stuck into a solid tree, or a grain of rice into it, by itself, does that look harmful?

MR. MCNEAL: I'm going to object to this. If counsel wanted to put this in his case, these are facts not in evidence.

THE COURT: The objection is overruled. These are fundamental laws of physics that either side can comment on.

MR. SMITH: The law of physics is force equals mass times volocity [sic] squared. What does that tell you? Is say this goes 25 miles an hour when it whipped 625 miles per hour, says [sic] this is a pound. That's how much force that's hitting a skull of someone. Volocity [sic] that's what makes it. When you consider that

being wielded by a guy who works out all the time, as he told you, a person who's half a foot shorter than he is, who's 75 to 80 pounds less than he is, it's conceivable that that blow was delivered by him."

The court allowed the comments in over defense objection, stating that either side can comment on the "fundamental laws of physics." The prosecutor also argued that the jury did not have to believe that the jump rope handles were the murder weapon in order to find defendant guilty beyond a reasonable doubt. He asserted that defendant "told you the truth in the statement, and he also lied."

■ A prosecutor's comments during closing argument that are based on facts in evidence or reasonable inferences therefrom are proper. (*People v. Franklin* (1990), 135 Ill. 2d 78, 100, 552 N.E.2d 743, 753.) In addition, if these comments were invited and not prejudicial, they do not constitute error. (*Franklin*, 135 Ill. 2d at 100, 552 N.E.2d at 753.) First, both the defense view of Dr. Donoghue's statements and the State's view are supported by his testimony. In addition, the prosecutor's comments were in reply to and invited by defense counsel's characterization of Dr. Donoghue's testimony. There was nothing improper about the State's comment that the blows conceivably could have been inflicted by defendant with the jump rope handles. Moreover, the prosecutor's general remarks about the laws of physics were not equivalent to testimony of facts not in issue. Any attorney can discuss subjects of general knowledge or common sense. Finally, assuming the comments on physics were improper, defendant has failed to show "reasonable grounds for believing the jury was prejudiced by the improper remarks." Based on the evidence the jury could have reasonably found defendant guilty beyond a reasonable doubt even if it did not believe that the jump rope handles were the murder weapon.

## IV

Defendant's final argument on appeal is that he was not proven guilty beyond a reasonable doubt because crucial parts of his incriminating statement were severely contradicted by the physical evidence presented by the State at trial and the only other evidence against defendant merely established that he had known or been with the victim sometime in the past. First, defendant asserts that the evidence showed that the victim was hit only once on the head by a hard object and that her other head injury resulted from her fall. This defendant says contradicts his statement which states that he hit her twice. Second, defendant argues that Dr. Donoghue's testimony was that the blow to the victim's forehead could not have been caused by a jump rope handle. As such, it

contradicts defendant's statement in which he states he hit the victim with the jump rope handle. Third, defendant contends that the evidence showed that the victim's body was found about 6 a.m. However, according to defendant's statement, he left his apartment at 5:30 a.m. Based on the different locations mentioned in defendant's statement, it would have been impossible for him to have travelled the 32 blocks in that half hour.

After a judgment of conviction, a reviewing court must look at the evidence in the light most favorable to the prosecution, and determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472-73, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) This standard is used because it is not for the reviewing court to substitute its judgment for the judgment of the jury, who heard the evidence and observed the witnesses. *Young*, 128 Ill. 2d at 49, 538 N.E.2d at 473.

■ Based on the evidence in the light most favorable to the prosecution, a rational finder of fact could have concluded defendant was guilty of murder beyond a reasonable doubt. The jury was entitled to believe parts of defendant's statement and not all of it. Based on the evidence, a rational jury could have concluded that defendant saw the victim the morning of her death, struck the victim, either with the jump rope handles or with another object, wrapped her in one of his blankets and dropped her off in front of the South Shore Hospital.

Accordingly, for the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.