THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE BERRIOS, Defendant-Appellant.

First District (5th Division)    No. 85—0459

Opinion filed December 23, 1988.

Mark X. Van Cura, of Winston & Strawn, and State Appellate Defender's Office, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Christopher J. Cummings, and Joan E. Disis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a jury trial, defendant, Jose Berrios, was convicted of the murder of Reynaldo Reyes and sentenced to 25 years' imprisonment, from which the defendant appeals. The sole issue on appeal is whether the trial court erred in denying defendant's motion to quash his arrest and suppress the evidence derived therefrom.

The testimony presented at the hearing on the defendant's motion to quash his arrest and suppress the evidence follows.

Defendant, Jose Berrios, testified that on July 13, 1983, between 2:30 p.m. and 3 p.m., he was approached by three plainclothes police officers at 1553 North Bell Street in Chicago. The officers asked the defendant for identification, and the defendant gave the officers his driver's license. The officers asked the defendant if he was known by the nickname "Casper" and defendant replied that he was not. The officers did not inform the defendant that a person known by the name "Casper" was involved in a shooting on June 30, 1983, or that they wanted to discuss with the defendant a shooting that took place on that date. One of the officers told the defendant that they were investigating an armed robbery and directed defendant to accompany them around the corner. The defendant did so, and around the corner, one of the officers questioned a small boy, who shook his head indicating that he did not know the defendant. Defendant testified that while he was in the police car with two of the officers, the officers did not tell him that he could leave the car. The officers told the defendant that they were going to take him to the police station because they were investigating a case and they wanted to take a picture of the defendant. The officers never told the defendant that he had a right to refuse to go with them to the police station and the defendant went with them.

When they arrived at the police station, defendant was taken to an interrogation room where an officer took his picture. Before taking the defendant's picture, the officers did not tell the defendant

that he had the right to an attorney. One of the officers began questioning the defendant "while the other *** ran out with the picture." The defendant was taken by the officers to an office, in which he remained for two hours. The defendant still was not told that he had a right to an attorney.

At about 6 p.m., the officers took the defendant to another police station. The officers handcuffed the defendant before transporting him there. At this point in defendant's testimony, the State stipulated that defendant was in police custody when he was taken from the first police station to the second police station.

The next witness called by the defendant was police officer Joseph Frugloi. Frugloi testified that on July 31, 1983, two Chicago police detectives, Ciangi and Healy, asked him if he knew or could locate a man named "Ortiz." Detectives Ciangi and Healy located Ortiz and took him to the police station, where Ciangi and Healy talked to him. After talking to Ortiz, Detectives Ciangi and Healy asked Officer Frugloi to go with them to North Avenue and Western Avenue to locate a man nicknamed "Casper." Ortiz had described Casper as Hispanic, white, with fair skin, light brown hair, about 5 feet 3 inches tall and weighing about 110 pounds. Officer Frugloi stated that they went looking for "Casper" because Ortiz had informed the officers that "Casper" was involved in a shooting. The officers knew that this information, which Ortiz gave the officers, was not based on Ortiz' firsthand knowledge.

At about 3 p.m. on July 13, 1983, Officers Frugloi, Ciangi and Healy located a man fitting Ortiz' description of "Casper" at 1555 North Bell Street. Officer Frugloi identified the defendant in court as the man they located. Officer Frugloi stated that Healy asked the defendant for identification and whether he was known by the nickname "Casper." The defendant showed his identification to the officers and told them that he was not known by the name "Casper." Officer Healy asked the defendant if he knew anyone named "Casper" who fit the description the officers had of "Casper." Defendant told Officer Frugloi that his nickname was not "Casper" and that nobody else in the neighborhood looked like him. Officer Frugloi testified further that Officer Healy asked the defendant if he would go with the officers to the police station to determine if defendant was "Casper" and that the defendant agreed to go. The defendant was taken to the station.

When they arrived at the police station, Ortiz identified defendant as "Casper." Officers Ciangi and Healy interrogated defendant out of Frugloi's presence. About 20 minutes later, Officer Frugloi

learned that the defendant's picture had been taken.

Officers Frugloi, Healy and Ciangi went to the area of the service station where the victim had been shot. Officer Frugloi stated that they showed the defendant's picture and the pictures of four other men to Nina Perea, whom they located near the service station, and that Nina Perea identified the defendant's picture to the officers as the picture of a man she had seen running from the service station into an alley after she heard shots fired in the alley behind the station on June 30, 1983, at the time of the shooting homicide.

Officer Edward Healy was the next witness called by the defendant. Healy testified that he was assigned to investigate the shooting of the victim and that on July 13, 1983, he conversed with Luis Ortiz at a Chicago police station. Healy left the station to look for "Casper," who Ortiz stated was involved in the shooting of the victim. Healy located a man fitting Casper's description at 1555 North Bell Street. Healy asked the man for identification. In court, Healy identified the man as the defendant. The defendant produced his identification and told Healy that his name was Jose Berrios and that his nickname was "Tony." Healy asked the defendant if he was also called "Casper," and the defendant said that he was not. Healy told the defendant that he was investigating a murder and that someone named "Casper," who fit defendant's description, was a possible suspect.

Healy related that the defendant agreed to go to the police station so that Ortiz could determine whether or not the defendant was "Casper." Defendant sat in the backseat of the squad car and they went to the police station. When they arrived at the police station Ortiz identified defendant as "Casper." Healy stated that he informed defendant that he had been identified as "Casper" and that he was going to take a photograph of defendant to show to a witness to determine if defendant was involved in a shooting.

Healy went to Nina Perea's house and showed her the photograph that he had just taken of the defendant at the police station. Nina Perea identified the defendant's picture to Healy as the picture of one of the men she saw running in the alley after the shooting. Healy testified that he returned to the police station, informed the defendant that he was under arrest, handcuffed the defendant and transported him to another police station. Healy admitted that the defendant was not committing any crime when they stopped him on the street and that they did not have any information that the defendant had committed any crime prior to their stopping him on the street on July 13, 1983.

Defense counsel showed Officer Healy an arrest report prepared by Healy which stated that the defendant was arrested on "13 July 83 at 1500 hours at 1555 North Bell on the street." Defense counsel asked Healy if at the time he completed the arrest report he considered defendant arrested. Healy replied, "That was a mistake, sir."

The defense rested. The State did not present any witnesses or evidence in opposition to the defendant's motion to quash his arrest and suppress evidence.

The trial judge summarized the foregoing testimony and concluded:

"They [the police] took his [defendant's] photograph and put it with some others, left Mr. Berrios [the defendant] sitting on a bench out in the squad room. He still was not cuffed or searched, and they go out and give a photo display to a witness who identifies the defendant as being the person that she told the police she had seen on the night of the shooting.

At that point the police had probable cause to seize the defendant; and they went back to the police station, placed him under arrest and processed him.

\*\*\* Even the defendant himself, when he testified in this case, did not say that he refused to go with the police, that he thought that he somehow didn't have any choice whether to go with them, that he refused to have his photograph taken or any of the other things that are involved.

\*\*\* I am not saying every time a policeman says he goes out and asks a citizen to go with him to the station, that this is not a seizure; but at least in this particular case, given all the evidence in this case, I am going to find the Fourth Amendment was not implicated until the seizure or until after the photo i.d. which by that time the evidence shows probable cause. So the Motion to Quash will be denied."

On this appeal, the defendant contends that his motion to quash his arrest and to suppress the evidence derived from his arrest was improperly denied by the trial court. The defendant urges that the trial court's foregoing conclusions: (1) that the defendant was not arrested on the street; (2) that the defendant was not in police custody or under arrest when he was taken by the officers to the police station or while in the police station when the officers took his picture; (3) that the defendant was not in police custody or under arrest until after the police had displayed the defendant's picture "to a witness who identified the defendant as being the person that she told the police she had seen on the night of the shooting"; (4) "at that point

the police had probable cause to seize the defendant"; (5) that the officer "went back to the police station, placed him under arrest and processed him"; (6) the defendant "did not say he refused to go with the police"; (7) "that he refused to have his picture taken"; and (8) that "the Fourth Amendment was not implicated until the seizure or until after the photo i.d. which by that time evidence shows probable cause," are irrational and controverted.

■ The State did not contend in the trial court and the State does not contend in this court that Ortiz had or conveyed to the officers any personal knowledge of Reyes' murder. Moreover, the State admitted that the description that Ortiz gave the officers was indeed a general and insufficiently specific description which befitted many persons within its ambit, and, in addition, no age description was given. The State conceded in the trial court and also in this court that the officers did not have probable cause to arrest the defendant when they initially encountered him on the street on North Bell Avenue. The State argued in the trial court and here that the defendant was not actually arrested until after the officers: (1) had taken him to the police station; (2) had taken the defendant's picture; (3) had gone from the station and displayed the defendant's picture to Nina Perea; (4) had the defendant's picture identified to them by Nina Perea as one of the men she saw running in the alley after the shooting; and (5) returned to the station and arrested the defendant, and contrary to the evidence, the trial court erroneously so found. We need not and we do not decide whether Perea's mere identification of the defendant to the officers as a person she observed running in an alley after the shooting was sufficient to establish probable cause for the defendant's subsequent arrest. We conclude from the evidence presented that the defendant was initially arrested by the officers on North Bell Street, from which the officers transported the defendant, under arrest, to the police station, and while under arrest at the police station, the officers took his picture and the defendant remained under arrest in the police station while the officers went out and displayed his picture to Perea. The officers returned to the police station and then their formal announcement to the defendant that he was under arrest was legally belated. The belatedness of their arrest announcement did not validate or avoid their initial unlawful arrest of the defendant.

The facts of the defendant's arrest in the case at bar and the trial court's validation thereof are strikingly similar to the facts of the defendant's arrest, which we held violated the defendant's constitutional right to be secure in his person against unreasonable seizure,

in our recent decision of *People v. Holveck* (1988), 171 Ill. App. 3d 38, 524 N.E.2d 1073.

In *Holveck* the defendant contended on appeal that his arrest was illegal and should have been quashed and that his post-arrest incriminating statements should have been suppressed. In *Holveck*, a police officer testified that he interviewed the victims, who described their assailant as a man with brown curly hair and a brown mustache, driving a gray car with black interior, vinyl bucket seats and a hole in the driver's seat. An officer testified that he stopped the defendant and requested the defendant to accompany him to the police station, where the defendant was interrogated by a detective and admitted the commission of various sex offenses. Defendant testified that he was stopped in his car by officers in two police cars with flashing red lights. The police officers asked for defendant's driver's license, which he gave to them. The police officers asked defendant if he could go with them to the police station to answer some questions and to "get a matter cleared up." The defendant agreed, but when defendant reached for his driver's license from the officer, the officer told the defendant he would have to go to the police station to have his license returned to him. The defendant drove his car to the police station, with a police squad car in front of him and another police squad car behind him. The defendant was placed in a room at the police station where an officer guarded the door. The defendant testified that he did not feel that he was free to leave the room. The defendant also stated that when he was initially stopped by the officers, he believed that he had no choice in going with the officers to the police station. The defendant signed a written waiver of his *Miranda* rights. The defendant further testified that the police did not take his keys, draw any weapons, touch him, or tell him that he was under arrest. This court, in holding that the defendant was unlawfully arrested on the street and taken to the police station and in reversing the defendant's conviction, stated:

> "The issue before us is whether the trial court correctly found that defendant was not arrested prior to making the first incriminating statement, but instead voluntarily consented to accompany the police to the police station and submit to questioning. The test to be applied here is whether a reasonable innocent man would have concluded that he was not free to leave when confronted with the circumstances confronting this defendant. [Citation.] The test is not a subjective one, and therefore it is irrelevant whether the defendant believed he was under arrest [citation] or whether the police intended to

detain the defendant against his will unless that intent was conveyed to the defendant. [Citation.] It is also well established that where there are significant indicia of coercion, a court will not find controlling the fact that a defendant was merely asked if he would accompany police [citations] or that he was not told he was under arrest or made to undergo booking procedures [citation]. Among the factors that courts have found significant in determining whether an arrest did take place are whether the defendant was confronted by a significant show of police force [citation], whether defendant was told he was free to leave [citation], whether defendant's freedom of movement was restricted by being deprived of his driver's license [citation], whether *Miranda* rights were read to him, and the purposefulness of the police conduct [citation].

\*\*\* In light of the factors we have cited, we find that, clearly, a reasonable innocent man confronted with this situation would have believed that he was not free to leave at the time that the police began their questioning.

This finding is reinforced by the purposefulness of the police conduct. The State has conceded that the officers had no probable cause to arrest the defendant when he was stopped. Officer Buschbacher admitted that defendant was committing no crime and he had no basis for arresting the defendant. \*\*\* \*\*\*

Based on all of this evidence it is clear that defendant was detained for interrogation without probable cause, in clear violation of his fourth amendment rights. [Citation.] It is also apparent that there were no intervening circumstances between this detention and defendant's initial confession such as would break the causal connection between those events. \*\*\* The only intervening event, the administration of *Miranda* warnings, was at best only a threshold requirement for establishing attenuation. [Citation.] Therefore the trial court erred in failing to quash defendant's arrest and to suppress the statements elicited from him during his interrogation following that arrest. Based on this finding defendant's convictions must be reversed and the cause remanded for a new trial." 171 Ill. App. 3d at 46-49.

Defendant also relies on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, which holds that a defendant's detention without probable cause for interrogation and identification violates his fourth amendment right to be secure in his person

against an unlawful seizure. In *Dunaway*, the victim was killed during an armed robbery. A police detective was told by a fellow police officer that an informant had provided a possible lead implicating the defendant in the crime. The detective questioned the source of the lead, but learned nothing that supplied "enough information to get a warrant" for the defendant's arrest. (442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251.) The detective, nevertheless, requested other detectives to "pick up" the defendant and "bring him in." (442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251.) The detectives found the defendant at a neighbor's house and took him into custody. The defendant was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by the police officers. The trial judge denied Dunaway's motion to quash his arrest and to suppress his statements and sketches of him. The United States Supreme Court, however, vacated Dunaway's judgment for conviction and remanded the case for consideration under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

The defendant in *Brown*, like the defendant in *Dunaway* and like the defendant in the case at bar, made inculpatory statements following his arrest without probable cause. Brown's motion to quash his arrest and suppress the evidence derived therefrom was denied and his statements were admitted as evidence to convict him. The Illinois Supreme Court held that, although Brown's arrest was unlawful, the admission of his statements was proper because his *Miranda* warnings broke the causal connection between the defendant's illegal arrest and the defendant's statements. The United States Supreme Court reversed Brown's conviction and held that the Illinois court erred in adopting a *per se* rule that *Miranda* warnings cured the fourth amendment violation. The United States Supreme Court further held that for Brown's statements to be admissible, the prosecution must show that they met the fifth amendment voluntariness standard and, also, that the causal connection between the defendant's statements and his illegal arrest was sufficiently broken to purge the primary taint of the illegal arrest in light of the distinct policies and interests of the fourth amendment. The Court held in *Dunaway*:

> "*Brown v. Illinois* [(1975)], 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 225, similarly disapproved arrests made for 'investigatory' purposes on less than probable cause. Although Brown's arrest had more of the trappings of a technical formal arrest than petitioner's, such differences in form must not be exalted over substance. Once in the police station, Brown was

taken to an interrogation room, and his experience was indistinguishable from petitioner's. Our condemnation of the police conduct in *Brown* fits equally the police conduct in this case:

'The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." *** The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. [Citations.]'

These passages *** reflect the conclusion that detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Dunaway*, 442 U.S. at 215-16, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258.

The factors in the instant case are as compelling as those in *Dunaway, Brown* and *Holveck*. Defendant in the instant case was confronted by a significant show of police force. Three plainclothes detectives drove up to the defendant on the street, required him to provide identification, and informed him that they were conducting a criminal investigation and that he was to accompany them to a police station. The defendant was not told at any time after the police officers accosted him that he was free to leave. Defendant was placed in the backseat of the police car and taken to a police station where he was photographed and interrogated. The lack of probable cause and the defendant's arrest, which, according to Officer Healy's arrest report, occurred when the officers put defendant in the squad car at 1553 North Bell Street, were virtually conceded by Officer Healy. Officer Healy's contrary testimony, that the statement in Healy's arrest report that the defendant was arrested when the officers picked him up on the street was "a mistake," is not persuasive. The officers acknowledged that the defendant was detained for investigatory purposes. As in *Dunaway* and *Brown*, the arrest of defendant Berrios was investigatory both in design and execution. "The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Dunaway v. New York* (1979), 442 U.S. 200, 60 L.

Ed. 2d 824, 99 S. Ct. 2248.

A reasonable man confronted with defendant's situation would have believed that he was not free to leave at the time the police began to interrogate him. The defendant was detained for interrogation without probable cause, in clear violation of his fourth amendment rights.

The trial court erred in denying defendant's motion to quash his arrest and suppress the statements and identification which resulted therefrom. We therefore reverse the defendant's conviction and remand the cause for a new trial.

Reversed and remanded.

LORENZ, P.J., and MURRAY, J., concur.