THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. LEE V. GRAHAM, Defendant-Appellee.

First District (5th Division)   No. 1—88—3411

Opinion filed May 24, 1991.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and Michael Leuer, Assistant State's Attorneys, of counsel), for the People.

Barry A. Spector, of Chicago (Mark Solock, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Lee Graham, was charged by indictment with two counts of first degree murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)) and one count of concealment of a homicidal death (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1(a)(1)). Prior to trial on these charges, defendant filed a motion to quash arrest and suppress evidence. A hearing was held on defendant's motion, and the motion was sustained and all statements made by defendant were suppressed. The State's subsequent motion for reconsideration was denied. The State appeals from both rulings, pursuant to Supreme Court Rule 604(a)(1) (107 Ill. 2d R. 604(a)(1)). On appeal, the State contends that (1) defendant was not illegally seized by police offi-

cers, but rather voluntarily accompanied them to the police station, and (2) even if defendant was illegally seized, his later statements were sufficiently attenuated from the illegality so as to be admissible. For the reasons set forth in this opinion, we affirm the trial court's rulings.

## FACTS

A murder occurred in Evanston, Illinois, in August of 1987. After several months of investigation, the Evanston police developed information which led them to believe that the defendant was involved. Three officers travelled from Evanston to Tuscaloosa, Alabama, in January of 1988 to question the defendant. The defendant made certain inculpatory statements to the police upon questioning at the Tuscaloosa police station. He was held overnight in the Tuscaloosa County jail, and the next morning was taken before a Tuscaloosa district court judge for an extradition hearing. After waiving extradition, defendant was driven to the airport for a flight back to Chicago, and during the drive, he made an additional statement to the police. Upon returning to Evanston, the defendant made a third statement regarding the murder.

Defendant's motion to quash his arrest and to suppress the products of that arrest alleged that he was arrested on January 28, 1988, at or near the Knox Hall dormitory on the campus of Stillman College in Tuscaloosa, Alabama, by Evanston, Illinois, police officers. Defendant further alleged that the arrest was a seizure as contemplated by the fourth amendment to the United States Constitution (U.S. Const., amend. IV), and was made without a warrant and without probable cause. Subsequent to defendant's "arrest" he was questioned by police and as a result police became aware of witnesses and evidence which defendant sought to suppress along with defendant's statements to police.

A hearing was held on defendant's motion on October 16, 1988. The defendant testified that on January 28, 1988, he was in Tuscaloosa, Alabama, on the campus of Stillman College. At approximately 10:30 a.m. he was leaving his second-floor dormitory room when he encountered Mr. Blackman, head of dormitory security. Mr. Blackman asked defendant if he was Kirby Brown, defendant's nickname. When defendant responded that he was, Mr. Blackman said "come with me," and defendant went with him.

Outside they encountered Dean Hubbard, Stillman's dean of students, who also asked defendant if he was Kirby Brown. When defendant said he was, Dean Hubbard said "come with me," and

defendant followed him. After taking about five steps, a car with four men in it, later identified as three Evanston police officers and one Tuscaloosa officer, pulled up and all got out of the car and stood around the defendant. One of the men asked defendant if he was Kirby Brown, to which defendant responded he was, and the man then identified himself as Sgt. Wernick of the Evanston police department, showing defendant his badge and a picture of the defendant. Defendant testified that he did not remember any of the other officers identifying themselves to him. Sgt. Wernick said "come with us," to which the defendant did not say anything, but went with them because he "felt like [he] didn't have no choice." The four police officers then drove defendant to a Tuscaloosa police facility, a ride of 10 minutes or less, with defendant sitting in the back seat of the car between two officers. The officers asked no questions of the defendant during the ride.

Defendant further testified that when he got into the car an officer grabbed him by the arm. Upon arrival at the station, he was told to get out of the car, and again an officer grabbed him by his arm. At the police station, defendant was patted down and his belongings were taken. He was then taken to another room and read his *Miranda* rights. Defendant testified that he was never shown an arrest or a search warrant, and that he did not voluntarily go with the officers to the police station.

On cross-examination defendant could not describe the officer who had grabbed his arm getting into and out of the police car, but said he knew it was one of the Evanston officers but not Sgt. Wernick. Defendant also denied that the Evanston police officers said they would like him to come to the police station, repeating his earlier statement that they said "come with us." He was not at that time told he was under arrest, but said that when they read him his rights, he "figured [he] was under arrest then."

The first of the State's witnesses was Officer Thomas Cubanski of the Evanston police department. He testified that in January of 1988 he was investigating a homicide which had occurred in Evanston five months earlier and that he went with two other Evanston police officers to Tuscaloosa, Alabama, seeking to interview the defendant. Upon arrival in Tuscaloosa, they met with the Tuscaloosa deputy police chief, who assigned a local officer, Investigator Adams, to work with them.

Cubanski and his fellow officers spoke with a girlfriend of the defendant who told them that he was staying in a dormitory on the campus of Stillman College with a friend. When they spoke with

Dean Hubbard, he told them that if the defendant was in fact on campus, he was not wanted there since he was not a student at that time. Hubbard said that he would go to look for defendant at the address given to him by the Evanston officers. The three Evanston officers and Investigator Adams drove to the campus in Adams' unmarked police car while the dean walked.

The next time Cubanski saw Hubbard, he was walking out of the dormitory with defendant. According to Cubanski, Sgt. Wernick asked defendant to accompany him to be interviewed and defendant said yes, he would be willing to do that. Defendant was never handcuffed, nor did the witness see anyone grab defendant's arm. Cubanski further stated that he heard Dean Hubbard tell the defendant that if he remained on campus, he would be arrested.

On cross-examination, Cubanski testified that they had not attempted to get an arrest warrant before going to Alabama and that he did not believe there was probable cause to arrest the defendant. Cubanski also stated that the defendant was not free to leave as they were driving to the police station, nor was he free to walk out of the police station. Cubanski testified that he did not have the power in his official capacity as an Evanston police officer to detain the defendant had he chosen to leave, but that he would have nonetheless stopped the defendant from leaving or asked Investigator Adams to do so had defendant tried to leave. At the station, the defendant was patted down and made to empty his pockets. He was then taken to a room and read his *Miranda* rights. At that time, Cubanski said that they had no more information than they had when they left Evanston, and had no probable cause to arrest the defendant.

The second witness for the State was Officer Sam Pettineo of the Evanston police department. Pettineo testified that when they first saw the defendant on campus, Sgt. Wernick and Pettineo walked up to the defendant and identified themselves as Evanston' police officers and told the defendant they needed to talk to him. Although the witness could not remember specifically the defendant's words, the defendant did say that he would talk with them. Pettineo said that when he and the other officers met the defendant outside Knox Hall, there was no place in the immediate vicinity to have a conversation. He did not, however, remember anyone telling the defendant that they had to go elsewhere to talk, nor did he hear the defendant say he did not wish to go with the officers.

On cross-examination, Pettineo stated that he did not believe they had probable cause to arrest the defendant when they went to

Tuscaloosa. He also said that the defendant walked up to the four officers as they were standing outside their car rather than the police walking up to the defendant.

The State's third and final witness was Sgt. Charles Wernick of the Evanston police department. He testified that he was in charge of the trip to Alabama. His testimony was essentially the same as that of Officer Cubanski regarding their trip from Evanston to Tuscaloosa, Alabama, and ultimately to the campus of Stillman College.

Sgt. Wernick testified that when the dean exited the dormitory with defendant, he approached them and identified himself to the defendant as a sergeant with the Evanston police department. When the sergeant told defendant he would like to talk with him, the defendant put his head down, looking towards the ground, and got into the car, an unmarked Alabama police car. According to Wernick, no one touched the defendant and defendant was not handcuffed. Moreover, Wernick stated that neither he nor his officers would have stopped the defendant had he walked away. Wernick and his fellow Evanston officers had discussed the matter and had agreed that they had no authority to detain the defendant if he had not wanted to talk with them. He also said that if one of the other Evanston officers had tried to stop the defendant from leaving, he would have prevented it. Sgt. Wernick agreed that he never told defendant that he was free to leave, but stated that the defendant never asked if he could leave and never made any attempt to leave. At the police station, defendant was taken to a room and read his *Miranda* warnings. Wernick acknowledged, as did the other two witnesses for the State, that although the police considered defendant a suspect, they did not have probable cause to arrest him.

After hearing arguments on the motion to quash defendant's arrest and suppress evidence, the trial judge ruled that defendant was arrested on campus without probable cause and that his presence at the police station was not consensual. He therefore sustained the motion to quash the arrest, and suppressed the evidence flowing from the illegal arrest.

The State subsequently filed a "Motion to Reconsider Certain Evidence Quashed by Defendant's Motion to Quash Arrest and Suppress Evidence." The State contended that the initial ruling was unclear as to exactly what evidence was suppressed, whether it was only the defendant's initial statement at the station or whether the court had also suppressed the later statements. If the later state-

ments had been suppressed, the State requested a hearing on attenuation to reconsider the suppression of the later statements.

In its motion to reconsider, the State contended that the court's ruling on defendant's motion appeared to suppress all evidence resulting immediately from the time of the arrest on January 28, 1988, up to the present time. The motion alleged the following additional facts which had not been presented at the hearing on the defendant's motion, facts which the State contended were sufficient to allow the later statements to be admissible: (1) Defendant was held overnight in Tuscaloosa pending extradition, and no conversations were had with defendant in the interim; (2) on the morning of January 29, defendant voluntarily waived extradition at a hearing in the district court in Tuscaloosa; (3) while driving to the airport after the extradition hearing, defendant made a spontaneous additional statement concerning his confession; and (4) after arriving back in Evanston, on the evening of the 29th, defendant made additional statements to a felony review assistant after being advised of his *Miranda* rights. The State contended that the statements on January 29 were sufficiently attenuated from the illegal arrest and should not be suppressed.

While the State argued that a hearing should be held on the issue of attenuation, the trial court found that even if the State's additional factual allegations were true, there was insufficient attenuation. The trial court thereupon denied the motion for reconsideration and affirmed that its order of suppression extended to the January 29 statements as well as the confession made on the 28th.

OPINION

■ On appeal, a trial court's ruling on a motion to quash an arrest and to suppress evidence will not be overturned unless it is manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299, 303.) Moreover where the evidence is merely contradictory, we will not substitute our assessment of credibility of the witnesses for that of the trial judge. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 149, 463 N.E.2d 929, 936.) Although the trial court did not expressly state which testimony it found to be credible, we must presume that it credited only the testimony which supports its ruling. (*Winters*, 97 Ill. 2d at 158, 454 N.E.2d at 303.) In this case, since the State is seeking reversal of the trial court's ruling in favor of the defendant, we must, unless clearly unreasonable,

consider as true the testimony favoring the defendant's position. *People v. Holloman* (1970), 46 Ill. 2d 311, 317, 263 N.E.2d 7, 11.

■ Before addressing the substantive issues, we first address a preliminary issue regarding the choice of law. The defendant at both the hearing on his motion and in his brief before this court raised the question of whether Alabama law or Illinois law should govern the issue of whether this was a valid arrest. The defendant contends that whether an arrest has occurred depends upon the State law of the place where the events transpired. In the trial court's ruling, it reasoned that State law might be applicable if we were dealing with the formalities of a valid arrest under State statutory law, but not in a case such as this, which is predicated solely upon the protections afforded to individuals under the fourth amendment of the United States Constitution. (U.S. Const., amend. IV.) We agree with the trial court. As the United States Supreme Court stated in *Dunaway v. New York* (1979), 442 U.S. 200, 212, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2256, "[t]he application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law." Our supreme court has stated:

> "[W]hether or not any given search and seizure is unconstitutional, as violative of the fourth and fifth amendments, as a matter of substantive law, is to be decided by the pronouncements of the United States Supreme Court. If a search and seizure is valid according to the opinions of the United States Supreme Court, the decision of a State court cannot make it invalid as a matter of Federal constitutional law." (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 354, 320 N.E.2d 1, 3.)

*A fortiori,* if a search and seizure is deemed invalid on fourth amendment grounds by the United States Supreme Court, the question as to the validity of the arrest under State law would be of no consequence. Thus the question as to choice of State law is neither dispositive nor truly pertinent, and our focus must be upon the fourth amendment issues under the Federal constitution.

■ To quash an arrest as violative of the fourth amendment and to suppress evidence based upon the illegality of that arrest, the burden is on the defendant to show that an illegal seizure has occurred. (Ill. Rev. Stat. 1989, ch. 38, par. 114—12(b); *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899.) To satisfy his burden he must prove two things: first, that a seizure occurred, and second, that the seizure was illegal. (*United States v. Black* (7th Cir. 1982), 675 F.2d 129, 132.) Here, the sole issue before us is

whether defendant was in fact seized, as the State concedes that the police lacked both probable cause as well as an arrest warrant to support a legal arrest. The State has instead argued that defendant was not in fact seized, but rather consented to accompany the officers to the police station for questioning.

■■■ The fourth amendment to the United States Constitution protects individuals from unreasonable searches and seizures. A seizure within the meaning of the fourth amendment occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.) As this court noted in *People v. Holveck* (1988), 171 Ill. App. 3d 38, 524 N.E.2d 1073:

> "The test is not a subjective one, and therefore it is irrelevant whether the defendant believed he was under arrest [citation] or whether the police intended to detain the defendant against his will unless that intent was conveyed to the defendant. [Citation.] It is also well established that where there are significant indicia of coercion, a court will not find controlling the fact that a defendant was merely asked if he would accompany police [citations] or that he was not told he was under arrest or made to undergo booking procedures." (171 Ill. App. 3d at 47, 524 N.E.2d at 1080.)

In determining what a reasonable person would believe under the circumstances, courts may look to several factors as indicia of coercion. These include the time and place of the confrontation, the number of officers, the presence or absence of family or friends, the presence of conduct normally involved in a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting, and the manner by which the individual is transported to the police station. (*People v. Gordon* (1990), 198 Ill. App. 3d 791, 796, 556 N.E.2d 573, 576.) The test focuses on the coercive effect of police conduct as a whole, and not on each particular detail of the police conduct in isolation. *People v. Stofer* (1989), 180 Ill. App. 3d 158, 166, 435 N.E.2d 1287, 1292.

■■■ In the instant case, the initial encounter between the defendant and the police took place on a sidewalk outside a college dormitory at 10:30 in the morning. According to the defendant, the four officers were standing around him. At least one of the officers, Sgt. Wernick, identified himself to the defendant as a police officer and showed the defendant a picture of himself. Officer Pettineo testified that he also identified himself as a police officer to the

defendant. Although the police were in an unmarked car and there was no testimony at the hearing as to whether the Evanston officers or Investigator Adams from Tuscaloosa was in uniform or in plain clothes, it would not be unreasonable for defendant to conclude that all four were police after being shown a badge by at least one of them.

There is no evidence that any of the defendant's family or friends were present. Two officials from Stillman College were nearby, but their commands to the defendant to "come with me" would seem to add to rather than lessen the coercive environment created by four police officers approaching one individual.

Defendant also testified that one of the officers grabbed his arm and led him into the car. While in the back of the police car, defendant, although not handcuffed, was seated between two police officers and was thus effectively restrained by their mere presence on either side of him. Although there was no testimony that the police showed weapons, we note that the Evanston police department sent not one but three officers to Alabama to question the defendant. By their sheer number a sense of force may be implied. See *People v. Berrios* (1988), 178 Ill. App. 3d 241, 250, 533 N.E.2d 64, 69 (three plainclothes detectives considered "significant show of force").

Also significant is the fact that defendant was driven by the police directly to the police station. (*Dunaway v. New York* (1979), 442 U.S. 200, 212, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2256 (petitioner taken into custody, transported to police station in police car).) He was not asked if he would go with the police, was not told where they were going, nor was he given the option of getting to the station by himself or meeting the police there at a later time. There was testimony that Sgt. Wernick simply said "come with me" and defendant was taken to the police station for questioning. (See *People v. Young* (1990), 206 Ill. App. 3d 789, 801, 564 N.E.2d 1254, 1263 (which held that defendant's consent to accompany officers to police station is not dispositive in light of the fact that the idea to go to the station first originated with the police).) In *Dunaway* the Court, in finding that the defendant had been seized, relied in part on the fact that the defendant had been taken from a neighbor's home to a police car and transported to a police station. Moreover, as in this case, the defendant was not questioned briefly where he was found, nor was he ever told that he was free to go.

Upon arrival at the station, defendant was told to get out of the car. Again, there was testimony that one of the officers grabbed the

defendant by the arm as he was getting out of the car. Inside the station, prior to questioning, defendant was frisked and made to empty his pockets and the police then went through his belongings. Although the State seeks to justify this search on the basis of security at the police station, a person being subjected to these procedures could reasonably believe he was not free to leave at this point. (See *United States v. Willis* (11th Cir. 1985), 759 F.2d 1486.) He was then taken to a small room and read his *Miranda* rights before questioning. Our supreme court has held that being read one's *Miranda* rights at the police station may be a factor contributing to a reasonable person's belief that he was in custody, even though, as shall be discussed later, it also warrants consideration as an attenuation factor. *People v. Townes* (1982), 91 Ill. 2d 32, 37, 435 N.E.2d 103, 105.

The State argues that the absence of a formal declaration of arrest and other routine procedures associated with a formal arrest permits, as a matter of law, the conclusion that no seizure has occurred, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, and *People v. Thomas* (1985), 139 Ill. App. 3d 163, 486 N.E.2d 1362, as authority for the proposition. However, as previously noted, in both *Mendenhall* and *Thomas* the courts looked to the totality of the circumstances surrounding the encounters between the citizens and the police to determine if a seizure had occurred. The absence of formalities of arrest, such as a declaration, fingerprinting or photographing, was but one of several factors considered by the courts, and while their presence may be evidence that a seizure occurred, it cannot be said that their absence compels an opposite conclusion. (See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046.) Moreover, we note that the defendant here was subjected to a pat-down and made to empty his pockets, as well as being read his *Miranda* rights, which by themselves may be considered procedures associated with an arrest.

The State also emphasizes that not one of the Evanston police officers had the authority to stop the defendant from leaving or to affect an arrest at any time before the inculpatory statements were made. However, from the time the Evanston police first encountered the defendant until the defendant made his inculpatory statements, an Alabama police officer was always present. Investigator Adams drove the Evanston officers to the Stillman College campus and then to the Tuscaloosa police station. At the station there were

several Alabama police present. They clearly had the authority to arrest the defendant. The test to determine whether a seizure has occurred is what a reasonable person would believe, and we fail to see how the lack of Evanston police authority to arrest a person would have any effect on that belief without being conveyed to that person, particularly in light of the fact that there were police present who did have such authority. (See *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 270, 401 N.E.2d 295, 297-98.) As we stated in *People v. Holvek* (1988), 171 Ill. App. 3d 38, 524 N.E.2d 1073, quoted above, the avowed noncoercive intentions of the police are irrelevant unless communicated to the defendant.

We also observe that the seizure of the defendant here had the "quality of purposefulness" about it which was denounced by the Supreme Court in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. (See also *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) Here, the police admittedly lacked probable cause to arrest the defendant prior to his statements made at the police station after interrogation. The officers acknowledged that the purpose of their trip was for questioning. *Brown, Dunaway,* and *Townes* make it clear that the fourth amendment prohibits such an "expedition for evidence." (*Brown,* 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.) In that regard we should note that although the uncommunicated intentions of the police are irrelevant to the issue of the defendant's reasonable belief, they may well be relevant in determining the "quality of purposefulness" of the police action. While Sgt. Wernick testified that he would not have detained the defendant and would have stopped his men from doing so had the defendant tried to leave, the trial court was free to believe the testimony of Officer Cubanski that he would have detained the defendant had he tried to leave.

The State contends that this case is analogous to *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929, in which this court upheld the trial court's denial of the defendant's motion to quash his arrest. There the defendant testified at a hearing on his motion to suppress statements that he agreed to accompany the police to the station for questioning. However, at a hearing on the motion to quash his arrest, the defendant testified that he objected to the officers' demands to accompany them. Further, several police officers testified that they did not intend to arrest the defendant and that the defendant did not object to their request to accompany them. They also told the defendant that he was not under arrest. There,

as here, there was conflicting testimony as to what transpired. As we stated earlier in regard to our standard of review, the credibility of witnesses and the weight to be given their testimony are uniquely the province of the trial court. In affirming the trial court's ruling in *Clay*, we did not find that the evidence compelled a finding that the defendant had voluntarily accompanied the police for questioning. Rather, we deferred to the trial court's assessment of the credibility of the witnesses and found that there was sufficient evidence to support the trial court's finding, which was therefore not manifestly erroneous. *Clay*, 124 Ill. App. 3d at 148-49, 463 N.E.2d at 936.

In this case we must also defer to the trial court's assessment of the credibility of the witnesses in its finding that the defendant did not voluntarily accompany the police to the station for questioning, a finding amply supported by the evidence. It is undisputed that four police officers confronted the defendant on the campus of Stillman College and drove him to the station for questioning. The testimony of the defendant as well as that of Officer Cubanski supports the finding that the defendant was not free to leave at that time.

Although the trial court relied in its ruling only on the events prior to arriving at the police station, we find the events which occurred at the station equally relevant to the issue of the defendant's reasonable belief. (See *People v. Clay* (1984), 124 Ill. App. 3d 140, 148, 463 N.E.2d 929, 936 (reviewing court may consider evidence adduced at trial which supports trial court's finding on motion to suppress).) At the station, not only was he patted down, but his belongings were searched and he was read his *Miranda* rights prior to questioning. Even had the defendant gone to the station voluntarily in the first instance, the treatment he received at the station would not be consistent with the mere elicitation of voluntary cooperation. (*People v. Young* (1990), 206 Ill. App. 3d 789, 801, 564 N.E.2d 1254, 1263.) Clearly, before making statements to the police which established probable cause for his arrest, the defendant, having been frisked, searched and read his rights, could reasonably believe that he was not free to leave. Based on the totality of the circumstances as set out in the record before us, we cannot say that the trial court's finding that the defendant was seized without probable cause is against the manifest weight of the evidence. Therefore we affirm the trial court's ruling quashing defendant's arrest.

■ We now proceed to address the State's second ground for appeal, the suppression of evidence flowing from the illegal arrest. A determination that a defendant was seized in violation of his fourth amendment rights does not *per se* result in the suppression of all statements made after the illegal arrest. Rather the issue becomes "whether [the] statements were obtained by exploitation of the illegality of [the] arrest." (*Brown v. Illinois* (1975), 422 U.S. 590, 600, 45 L. Ed. 2d 416, 425, 95 S. Ct. 2254, 2260.) Confessions following an illegal arrest are presumed to be the product of the illegality. (*People v. Riszowski* (1974), 22 Ill. App. 3d 741, 746-47, 318 N.E.2d 10, 14-15.) Once the defendant has established the illegality of his arrest, the State bears the burden of establishing by clear and convincing evidence that subsequent statements were sufficiently attenuated from the illegality so as to be purged of its taint. *People v. Nash* (1979), 78 Ill. App. 3d 172, 177, 397 N.E.2d 480, 484.

Defendant here made three statements following his illegal arrest. The first was two hours after the arrest, the second approximately 24 hours later, and the third eight hours after the second. The State, in its motion before the trial court, argued that the second and third were sufficiently attenuated so as to be admissible. Before this court the State appears to be arguing that all three statements should be admissible. The trial court found that the second and third statements were not sufficiently attenuated from the illegal arrest so as to be admissible. Implicit in that finding is a finding that the first statement was also not attenuated from the illegality. As discussed below, we find that the trial court's ruling, explicitly as to the second and third statements and implicitly as to the first, was not against the manifest weight of the evidence and we therefore affirm.

■ In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the Supreme Court addressed the issue of the admissibility of statements made following an illegal arrest. The Court listed the factors to be considered in determining whether a later statement was sufficiently attenuated from the illegality so as to be deemed a product of the defendant's free will, and therefore admissible, rather than a result of the illegality and inadmissible. These factors include the presence or absence of *Miranda* warnings, the temporal proximity of the arrest and the statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

Here the defendant received *Miranda* warnings twice. The first were given shortly after his arrival at the Tuscaloosa police station, before he was interrogated and gave his first statement. He was again read his rights prior to his third statement. However, the giving of *Miranda* warnings to an individual in custody prior to interrogation is merely a threshold requirement to the admissibility of statements following an illegal arrest. (*People v. Stofer* (1989), 180 Ill. App. 3d 158, 169, 534 N.E.2d 1287, 1293.) They cannot alone and *per se* purge the taint of an illegal arrest. (*Brown*, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261.) We must, therefore, consider the other attenuating factors set forth in *Brown*.

Regarding the temporal proximity of his arrest and his statements, the three statements were made approximately 2, 24, and 36 hours after his arrest. The mere passage of time alone, however, is insufficient by itself to purge the taint of an illegal arrest. (*People v. Lekas* (1987), 155 Ill. App. 3d 391, 414, 508 N.E.2d 221, 237.) As Mr. Justice Stevens observed in his concurring opinion in *Dunaway v. New York* (1979), "[t]he temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one. Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister." (*Dunaway v. New York* (1979), 442 U.S. 200, 220, 60 L. Ed. 2d 824, 841, 99 S. Ct. 2248, 2260-61 (Stevens, J., concurring).) The key, therefore, in determining whether the passage of time has purged the taint of an illegal arrest is to examine what if any intervening events occurred during that time, and the nature of those events. *People v. Stofer* (1989), 180 Ill. App. 3d 158, 169, 534 N.E.2d 1287, 1294.

During the two hours between the illegal arrest and the first statement, there were no intervening events. All that transpired was the police interrogation of the defendant. Clearly the taint is not purged from that statement. (*Brown*, 422 U.S at 604, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.) During the next 24 hours, the defendant was held overnight in the Tuscaloosa County jail. There were no discussions with him about the case until he appeared the next morning at an extradition hearing in district court in Tuscaloosa. After the hearing, he was turned over to the Evanston police, and while on the way to the airport to be returned to Illinois, he made an unsolicited statement to the police. Eight hours later, back in Evanston, the defendant made his third statement, this time to a felony review assistant after being given *Miranda* warnings.

■ The State maintains that defendant's overnight detention, his voluntary waiver of extradition, his trip back to Evanston, and his meeting with another law enforcement official constitute intervening events sufficient to purge the taint. To purge the taint of an illegal arrest, an intervening event, considered along with the other factors of *Brown*, must have such an effect on the defendant so that his statement made after the event is an exercise of his free will, and not an exploitation of the initial illegality. (*People v. White* (1987), 117 Ill. 2d 194, 222, 512 N.E.2d 677, 688.) Circumstances under which courts have found attenuation based on intervening events include the defendant being confronted with legally seized evidence, seeing his girlfriend at the police station and being told she was cooperating with the police and being confronted with sketches which resembled himself made prior to his arrest. (See *People v. Foskey* (1990), 136 Ill. 2d 66, 87-88, 554 N.E.2d 192, 203 (and cases cited therein).) The events in this case, unlike those cited in *Foskey*, follow directly from the illegal arrest. There is no break in the chain of causation from the illegal arrest to the later statements.

■ The validity of the trial court's finding that the second and third statements were the result of the illegal arrest is reinforced by *People v. Thomas* (1980), 80 Ill. App. 3d 1121, 400 N.E.2d 1019, a case like the present one dealing with multiple statements. Relying on *Brown* and *Dunaway*, the court found that when an initial statement, made shortly after an illegal arrest, is found to be caused by that arrest, the earlier statement creates a serious doubt that the later statement was made as a result of free will. Instead, the later statement is "the result and the fruit of the first." *Brown v. Illinois* (1974), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.

As to the final *Brown* factor, the purpose and flagrancy of the official misconduct, we have addressed this earlier in our discussion of defendant's illegal arrest. We simply note here the police have acknowledged that they were in Alabama for the sole purpose of questioning the defendant about a murder. As in *Brown*, "[t]he arrest, both in design and in execution, was investigatory." *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.

The State contends that this case is analogous to *People v. Bracy* (1986), 152 Ill. App. 3d 566, 504 N.E.2d 764. We disagree. On almost every one of the *Brown* factors, *Bracy* is distinguishable from the instant case. In *Bracy* there were significant intervening circumstances between the arrest and the statement. Bracy saw his

girlfriend at the police station and was told she was cooperating with the police. In addition, he saw the proceeds of the robbery on a desk at the station before he made his statement. Moreover, in *Bracy* 24 hours passed between the defendant's arrest and his first and only inculpatory statement. Furthermore, unlike the present case, there was no evidence that the police arrested Bracy for the purpose of obtaining his statement, and the court found it not to be a case of flagrant official misconduct.

In denying the State's motion to reconsider, the trial court expressly assumed the additional allegations made in the State's motion to be true, thereby obviating the need for an additional evidentiary hearing to establish those factual allegations. In its ruling the trial court explicitly found insufficient attenuation to redeem the second and third statements as well as the first. Based on our review of the record and our analysis of the factors set forth in *Brown,* we cannot say that its ruling was against the manifest weight of the evidence.

For the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

MURRAY and McNULTY, JJ., concur.